

FILED

# UNITED STATES DISTRICT COURT

AUG 04 2016

for the

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) <br> ) <br> Dell 630 Laptop Computer, Serial Number ) <br> BJB6GG1, CURRENTLY LOCATED AT ) <br> 4500 Orange Grove Avenue, Sacramento, ) <br> California 95841 ) <br> ) | Case No. 2:16 - SW - 0472   AC |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire fraud |
| 18 U.S.C. § 1621 | Perjury |
| 18 U.S.C. § 1623 | False declarations before grand jury or court |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Reginald L. Coleman, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/4/16

*Judge's signature*

City and state:   Sacramento, California                              Allison Claire, U.S. Magistrate Judge

*Printed name and title*

## ATTACHMENT A

The property to be searched is a Dell 630 Laptop Computer, Serial Number BJB6GG1, hereinafter the "Device." The Device is currently located at 4500 Orange Grove Avenue, Sacramento, California 95841.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of 18 U.S.C. §§ 1343, and involve SAIDY IRAIQAT since September 1, 2004, including:

     a.  Any communications between IRAIQUAT, SIHNER, and other members of the conspiracy;

     b.  Any records relating to the G-RAP program;

     c.  Any communications between IRAIQAT and DOCUPAK, including but not limited to notifications sent to IRAIQAT that a potential soldier has been claimed by a Recruiter's Assistant in the G-RAP program;

     d.  Any records relating to potential soldiers and related personal identifying information;

     e.  Records reflecting the dates on which IRAIQAT met or communicated with potential soldiers, including but not limited to scheduling communications and calendar entries;

     f.  Types and amounts of any bribes or kickbacks for participation in the conspiracy as well as dates, places, and amounts of specific transactions;

2.      Evidence of user attribution showing who used the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

PHILLIP A. TALBERT
Acting United States Attorney
KATHERINE LYDON
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900


Attorneys for Plaintiff
United States of America

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| In the Matter of the Search of: | CASE NO. |
|---|---|
| Dell 630 Laptop Computer, Serial Number BJB6GG1, CURRENTLY LOCATED AT 4500 Orange Grove Avenue, Sacramento, California 95841 | AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH DEVICE |

    1.     I, Reginald L. Coleman, being first duly sworn, hereby depose and state as follows:

### I.    INTRODUCTION AND AGENT BACKGROUND

    2.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

    3.     I am a Special Agent with the Federal Bureau of Investigation, and have been since September 1998. I am currently assigned to the Sacramento Field Office and investigate public corruption, government fraud and various financial crimes. The financial crimes investigated include, but are not limited to, bribery and kickback schemes, bank fraud, bankruptcy fraud, credit card fraud, mail fraud, wire fraud, identity theft and money laundering. In this capacity, I have received training and have become familiar with the investigation and prosecution of these types of crimes, including the use of various criminal methods used to perpetrate those frauds.

4.      For the past 18 years, I have investigated and participated in numerous cases involving various frauds and/or schemes to defraud individuals and entities, both public and private. During my 18 years as a Special Agent, I have also participated in the service of numerous federal and state arrest and search warrants. The details contained in this affidavit are a compilation of information developed during an investigation conducted by myself and other agents of other federal law enforcement agencies. In addition to my own training and experience, I have communicated with and relied upon information gathered from investigators from various agencies who specialize or have special expertise in the area of computer forensics and/or United States Army National Guard recruiting practices and policies.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## II.      IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.      The property to be searched is a Dell 630 Laptop Computer, Serial Number BJB6GG1, hereinafter the "Device." The Device is currently located at the FBI office located at 4500 Orange Grove Avenue, Sacramento, California 95841.

7.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## III.      PROBABLE CAUSE

8.      From about September 1, 2004, to at least October 19, 2011, SAIDY IRAIQAT, was a recruiter for the California Army National Guard ("CANG"). Recruiter IRAIQAT was assigned by the CANG the electronic device this warrant seeks authorization to search: Dell 630 Laptop Computer, Serial Number BJB6GG1.

9.      Evidence I have reviewed indicates that from on or about December 27, 2007, to at least May 7, 2010, within the State and Eastern District of California, SAIDY IRAIQAT, RICHARD C. SIHNER, and others known and unknown, knowingly devised, intended to devise, and/or participated in a material scheme and artifice to defraud and to obtain money by materially false and fraudulent pretenses, representations, and promises. Evidence also indicates that on January 20, 2016, IRAIQAT perjured himself at the trial of his co-conspirator, SIHNER, in the Eastern District of California, including by testifying that IRAIQAT did not provide the Social Security Numbers and other identifying

information of potential recruits to SIHNER in furtherance of the conspiracy. There is probable cause to believe the Device contains evidence of those crimes.

10.     The purpose of the scheme was to induce Document and Packaging Brokers, Inc. ("DOCUPAK") to send bonus money to retired CANG 1st Sergeant SIHNER based on SIHNER's false and fraudulent representations that he had referred individuals to enlist in the CANG. In fact, those potential soldiers enlisted on their own or were referred by people other than SIHNER. SIHNER was charged with 18 counts of Wire Fraud and one count of False Statements to a Federal Agent. After a trial by jury, SIHNER was convicted of all counts on January 22, 2016.

11.     At all times relevant to the events described herein, DOCUPAK administered a program called the Guard Recruiting Assistance Program ("G-RAP").

12.     The goal of G-RAP was to establish a position of strength from which the Army National Guard could achieve its recruitment mission and increase its number of qualified officers and soldiers. G-RAP was a United States Government program designed for active or retired servicemen and women to serve as Recruiting Assistants (RAs). RAs were supposed to cultivate quality potential soldiers and officers from within their individual spheres of influence. Once a potential soldier or officer was identified, pre-qualified and nominated, the RA was supposed to facilitate a meeting with a recruiter of choice. The recruiter, the RA, and the nominee worked closely together to process the nominee toward enlistment or commission. After the process of nomination, the recruiter assumed the duties and responsibilities of enlisting the potential soldier.

13.     RAs were eligible for financial incentives for having nominated a potential soldier. Depending on whether the nominee was enlisting or receiving an officer's commission, financial incentives for RAs ranged between $2,000 and $7,500 per recruit. An RA received one-half of the recruitment bonus when the nominee signed a contract to enlist in the CANG. The second half of the bonus was paid once the nominee departed to basic training.

14.     In order for an RA to qualify for the G-RAP bonus, it was imperative for the RA to have introduced a potential soldier or otherwise influenced and convinced the new recruit to join the National Guard.

15.     Recruiters such as IRAIQAT were ineligible to participate in the G-RAP bonus program,

as recruiting was their occupation within the CANG.

16.     RAs such as SIHNER used a computerized system administered by DOCUPAK to apply for the compensation and make notes about their involvement in the recruiting process.

17.     Between on or about December 27, 2007 and May 7, 2010, SIHNER, or someone acting on his behalf, entered the names of at least 29 potential soldiers into the computerized system administered by DOCUPAK and selected SAIDY IRAIQAT as the recruiter to whom the referral was to be sent.

18.     After SIHNER input these soldiers' personal identifying information and nominated them in the DOCUPAK system, DOCUPAK notified recruiter SAIDY IRAIQAT.

19.     As a result of SIHNER's false claims, DOCUPAK wired money into SIHNER's bank account.

20.     During SIHNER's January 2016 trial, 14 soldiers testified that SIHNER was not responsible for their recruitment as he (SIHNER) had claimed under the G-RAP bonus program.  In fact, all testified they were brought in by other means, including being recruited by SAIDY IRAIQAT.  The majority of these soldiers claimed they only gave their personal information, including dates of birth and social security numbers, to recruiter IRAIQAT.

21.     There is probable cause to believe IRAIQAT provided potential soldiers' personal identifying information to unauthorized persons, including SIHNER, to perpetuate the scheme and enable SIHNER to be wired bonuses by DOCUPAK for referring soldiers to CANG when, in fact, SIHNER had not referred those soldiers.   Specifically:

a)      On April 16, 2010, SIHNER's account with DOCUPAK was disabled after an internal audit revealed a number of potential soldiers (claimed by SIHNER) had only given their personal information to Recruiting and Retention Non-Commissioned Officer (RRNCO) SAIDY IRAIQAT.

b)      On May 7, 2010, SIHNER was terminated "With Cause" by DOCUPAK.  At that time, DOCUPAK Manager WILLIAM STEWART documented that SIHNER "admitted getting the personal information from the RRNCO."

c)      Many of the soldiers who SIHNER claimed in the G-RAP system testified at SIHNER's

trial that they had provided their personal identifying information to IRAIQAT, not SIHNER.

22.     Stated differently, there is probable cause to believe that IRAIQAT committed wire fraud in violation of 18 U.S.C. § 1343 by providing potential soldiers personal identifying information to SIHNER as part of the scheme to defraud.

23.     There is probable cause to believe IRAIQAT committed perjury in violation of 18 U.S.C. §§ 1621 and 1623 in his testimony at SIHNER's trial.  IRAIQAT testified he never provided potential soldiers' personal information to SIHNER.  IRAIQAT also testified that some of the recruits discussed in his testimony were brought to him by SIHNER, before testifying that he did not actually remember SIHNER bringing him any of the soldiers who had been discussed in his trial testimony. A transcript of IRAIQAT's trial testimony is attached hereto as Exhibit A.

24.     The Device may contain evidence that IRAIQAT did indeed provide potential soldiers personal identifying information to unauthorized persons, including SIHNER, which would be evidence of both wire fraud and perjury.  If IRAIQAT sent the personal identifying information electronically, records reflecting such transmittal could be in the instant messaging system, Microsoft Outlook .pst files, or other files retained on the computer.  If IRAIQAT provided the information to SIHNER in hard copy, the print spool records might reflect that IRAIQAT printed files with titles including potential soldiers' names before SIHNER claimed those potential soldiers in G-RAP.

25.     The Device may contain communications between IRAIQAT and his co-conspirator(s) regarding the conspiracy. This could be in the instant messaging system, Microsoft Outlook.pst files, or other files retained on the Device, including but not limited to any files that could have been received when the Device synced with any cell phone, tablet, PDA, or camera IRAIQAT may have used.

26.     The Device may contain evidence that IRAIQAT met with potential soldiers before SIHNER claimed them in the G-RAP system.  This evidence could include electronic communications with soldiers or calendar entries reflecting appointments with soldiers on dates before the dates which G-RAP records SIHNER entered the soldiers' information into G-RAP.

27.     The Device is currently in the lawful possession of the Federal Bureau of Investigation. It came into the Federal Bureau of Investigation's possession in the following way:  On February 25, 2013, Agents took possession of the Device from the California State Provost Marshal's Office, who

had placed the Device in evidence pending an internal investigation. The Provost Marshal's Office handles internal investigations for the CANG. The Provost Marshal's Office indicated the FBI and Army CID were authorized to examine the Device, and provided potential passwords in an effort to assist in unlocking the Device. Therefore, while the Federal Bureau of Investigation might already have all necessary authority to examine the Device in that the owner of the Device has consented to such examination, I seek this warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

## IV.     TECHNICAL TERMS

28.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a)     Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

b)     Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

c)     PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet

and send and receive e-mail and text messages.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

d)      Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

e)      IP Address:  An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

f)      Internet:  The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

29.      Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as digital camera storage device, portable media player, PDA storage device, wireless communication device and Internet-capable machine containing various identifiers, including

IP Addresses.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## V.     ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

31.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a)     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b)     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c)     Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives-contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d)     Similarly, files that have been viewed via the Internet are sometimes automatically

downloaded into a temporary Internet directory or "cache."

32.     Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a)      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b)      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c)      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d)      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the

scope of the warrant.

e)      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f)      I know that when an individual uses an electronic device, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

33.     <u>Nature of examination.</u>  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

34.     <u>Manner of execution.</u>  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## VI.    **CONCLUSION**

35.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Reginald L. Coleman
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on:    8/4/16

The Honorable Allison Claire
UNITED STATES MAGISTRATE JUDGE

Approved as to form by AUSA KATHERINE LYDON

# EXHIBIT A

1

```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF CALIFORNIA
             BEFORE THE HONORABLE JOHN A. MENDEZ, JUDGE

                           ---o0o---


UNITED STATES OF AMERICA

        Plaintiff,

Vs.                                   CASE NO. 2:14-CR-151 JAM

RICHARD SIHNER,

        Defendant.
_____/


                 REPORTER'S TRANSCRIPT OF PROCEEDINGS
    RE:   JURY TRIAL EXCERPT - TRIAL TESTIMONY OF SAIDY IRAIQAT
              WEDNESDAY, JANUARY 20TH, 2016 - 10:00 A.M.


For the Plaintiffs:      OFFICE OF THE UNITED STATES ATTORNEY
                         501 I Street, Suite 10-100
                         Sacramento, California  95814

                         BY:  MATTHEW MORRIS, AUSA
                         BY:  KATHERINE LYDON, AUSA


For the Defendant:       OFFICE OF THE FEDERAL DEFENDER
                         801 I Streeet, 3rd Floor
                         Sacramento, California  95814

                         BY:  DOUG BEEVERS, Asst. Fed. Def.
                         BY:  SEAN RIORDAN, Asst. Fed. Def.



Reported by:  CATHERINE E.F. BODENE, CSR #6926, RPR
              Official Court Reporter USDC, 916-446-6360
              501 I Street, Room 4-200
              Sacramento, California  95814


TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

2.

1                         EXAMINATION INDEX

2                             ---o0o---

3

4

5       FOR THE DEFENDANT:

6       EXAMINATION:                                    PAGE

7         SAIDY IRAIQAT

8         By the Court                              5
          Direct Examination by Mr. Beevers         7
9         Cross-Examination by Ms. Lydon            26
          Redirect Examination by Mr. Beevers       48
10        Recross-Examination by Ms. Lydon          64

11

12

13

14

15                            ---o0o---

16

17

18

19

20

21

22

23

24

25

3

1    SACRAMENTO, CALIFORNIA, WEDNESDAY, JANUARY 20, 2016, 10:00 A.M.

2                              ---o0o---

3        (Excerpt from trial proceedings.)

4            THE COURT:  Which exhibit, Mr. Beevers?

5            MR. BEEVERS:  K, Your Honor.

6            MR. MORRIS:  Your Honor, in addition to Exhibit K, I

7    think we have notes from Investigator Doig's interview of this

8    witness.  We'll see if you can get a copy of that so you're

9    aware of everything that might be raised in both direct and

10   cross.

11           THE COURT:  These are notes of Mr. Doig's interview?

12           MR. MORRIS:  Mr. Doig's interview with Mr. Iraiqat in

13   addition to this report, which was Exhibit K, which was our

14   interview with him.

15           THE COURT:  So he was interviewed on December 28th,

16   2015, right?

17       By telephone.  Okay.

18       (Brief pause.  Court reviews exhibits.)

19           MR. RIORDAN:  Your Honor, we have a copier here in

20   court.  We can make copies of the notes or our paralegal can

21   run upstairs.

22           THE COURT:  You can make a copy here if it is easier.

23       (Copy made and handed to the court.)

24           MR. RIORDAN:  Your Honor, is it okay for Mr. Sihner to

25   use the restroom?

4

1          THE COURT:  Yes.  Fine.  Where is Mr. Doig?

2     Let's go off the record.

3     (Discussion held off the record.)

4          THE COURT:  Back on the record outside the presence of

5     the jury.

6     The court has reviewed Exhibit K and Exhibit KK.  Exhibit K

7     are the notes from an interview on December 28th, 2015, with

8     Mr. Iraiqat by the Special Agent Daniel Wallace, and Exhibit KK

9     are notes from Mr. Doig of an interview -- phone interview with

10    Mr. Iraiqat on June 14th, 2014.

11    He'll be allowed to testify.  You'll be allowed to ask him

12    about the attempted bribery.

13    I won't let you get into details, but depending on which

14    way he answers, we may have to have further discussion.  I'm

15    simply going to advise him about the penalties of perjury, and

16    then it is his call whether he wants a lawyer or not.

17    All right.  Let's bring him in.

18    (Saidy Iraiqat enters the courtroom.)

19         THE CLERK:  Right up here.  Right up to the witness

20    box, if you would.  Please, have a seat.  Raise your right

21    hand.

22    (WHEREUPON, SAIDY IRAIQAT, WAS CALLED AS A WITNESS AND SWORN)

23         THE CLERK:  State your full name for us and spell your

24    name.

25         THE WITNESS:  My name is Saidy Said Iraiqat,

5

1    S-a-i-d-y, S-a-i-d, I-r-a-i-q-a-t.

2         THE COURT:  Mr. Iraiqat, I brought you in before

3    bringing the jury back in just to go over some rights that you

4    have as a witness who has been subpoenaed here to testify.  I

5    understand you are here pursuant to a subpoena, correct?

6         THE WITNESS:  Correct.

7         THE COURT:  Okay.  And I've reviewed statements that

8    you have given both to the defense investigator and to the

9    government's agents.  I have a general idea of what you are

10   expected to testify about in this trial.

11       What I need to advise you about before you testify is that

12   you obviously have a right to counsel, separate counsel, before

13   you testify.

14       So the first question I have for you is, do you have an

15   attorney here with you?

16         THE WITNESS:  I do not.

17         THE COURT:  Because you have taken an oath to testify,

18   you have taken an oath to testify truthfully.  That means you

19   could be subject to the penalties of perjury if you lie in this

20   proceeding.

21       I want to make sure that you understand that clearly, that

22   it is a separate crime that can be charged for lying,

23   committing perjury, at a trial.  I just want to make sure you

24   understand that.

25         THE WITNESS:  Yes, sir.

6

1       THE COURT:  You have to answer both sides' questions

2  honestly.  Do you understand that?

3       THE WITNESS:  Yes, I do.

4       THE COURT:  Okay.  You also are possibly, even though

5  you have not been indicted and no criminal charges have been

6  brought against you, it is still a possibility that you are a

7  subject, which means that the government may still be

8  investigating you with respect to the incidents that led to the

9  indictment in this case.

10      I'm not sure if you're aware of that.

11      THE WITNESS:  I'm not.

12      THE COURT:  But that's a possibility as well.  So any

13  answers that you give in a trial can be used against you.  That

14  means that you could incriminate yourself, and you have an

15  absolute right under the Constitution not to incriminate

16  yourself, not to give answers.

17      I'm sure you have seen it, if you have watched movies or TV

18  shows, someone says "I take the Fifth."  That simply means I'm

19  not going to answer your question because it may incriminate

20  me, it may lead to possible incriminating evidence.

21      So as a witness, you also have that right under the Fifth

22  Amendment of the Constitution.  I want to make sure you

23  understand that.

24      THE WITNESS:  I do.

25      THE COURT:  Okay.  Do you want to speak to an attorney

1    or have an attorney present before you testify here this

2    morning?

3            THE WITNESS:  No, I do not.

4            THE COURT:  Okay.  You are absolutely certain of that?

5            THE WITNESS:  Yes, I am.

6            THE COURT:  Okay.  We're going to bring in the jury

7    then.  And Mr. Beevers will ask you questions first, and then

8    the government will cross-examine.  Okay?

9            THE WITNESS:  Yes, sir.

10           THE COURT:  All right.

11       (Jury seated at 10:15 a.m.)

12           THE COURT:  Okay.  Mr. Vine, let's do this in front of

13    the jury again.

14           THE CLERK:  Yes, Your Honor.

15       Raise your right hand.

16    (WHEREUPON, SAIDY IRAIQAT WAS CALLED AS A WITNESS AND SWORN)

17           THE CLERK:  Please, state your full name and spell it

18    for the record.

19           THE WITNESS:  My name is Saidy Said Iraiqat,

20    S-a-i-d-y, middle name S-a-i-d, last name I-r-a-i-q-a-t.

21           THE CLERK:  Thank you.

22                        DIRECT EXAMINATION

23    BY MR. BEEVERS:

24    Q.  Can you tell us what you do for a living?

25           THE COURT:  Keep that mic in front of you.

1    BY MR. BEEVERS:

2    Q.   What do you do for a living?

3    A.   I build condensers in Texas.   I work for Munters DryCool.

4    Q.   Do you know the defendant, Richard Sihner?

5    A.   I do.

6    Q.   Can you identify -- is he anywhere in the courtroom?

7    A.   Yes, he is.

8    Q.   Can you point him out and say what he's wearing?

9    A.   That's Rick over there.   He is wearing a blue tie and

10   blazer.

11            THE COURT:   He's identified the defendant.

12   BY MR. BEEVERS:

13   Q.   How did you first meet him?

14   A.   Rick and I - Rick was a Gray Beard for the California Army

15   National Guard.   He was part of the Gray Beard Program.   And

16   they were brought in to train recruiters because they had

17   extensive experience.

18   Q.   Were you one of the people he trained?

19   A.   I was one of many people that he talked to, yes.

20   Q.   And what year was that?   About?

21   A.   2004.   2005.

22   Q.   After that time did you have further contact with

23   Mr. Sihner?

24   A.   Yes, I did.

25   Q.   What type?

1    A.   Work-related.  After he was -- the Gray Beard Program

2    stopped, the Guard Recruiting Assistance Program came into

3    effect, and I worked with him on several accounts.

4    Q.   And under the Gray Beard Program, what kind of things did

5    he teach you?

6    A.   He taught me how to identify leads, applicants that were

7    interested in joining the military.  General recruiting stuff,

8    because he had been a recruiter for 24 years.  He was passing

9    on his knowledge to the younger group of recruiters.

10       I wasn't the only one.  They brought the Gray Beards in to

11   teach all of the new recruiters how to do their job.

12   Q.   In your work -- how long did you work as a recruiter --

13   uniformed recruiter?

14   A.   From 2004 to October of 2011.

15   Q.   And during your time as a recruiter, did you use any of the

16   recruiting techniques that Rick Sihner taught you?

17   A.   Among many others, yes.

18   Q.   Did you ever observe Rick Sihner talking to potential

19   recruits?

20   A.   Yes, I did.

21   Q.   How many potential recruits can you estimate you ever saw

22   Rick Sihner talk to?

23             THE COURT:  During what period of time?

24   BY MR. BEEVERS:

25   Q.   During the time that -- how many years did you work with

1   Rick Sihner when he was in the G-RAP program?

2   A.   I'm not quite sure when the G-RAP program ended.  I think

3   it was in 2008, 2009.  Somewhere around there.

4   Q.   Okay.  Do you remember the G-RAP program in general?

5   A.   I do.

6   Q.   And were you aware that -- did Mr. Sihner work in the G-RAP

7   program while you were in the office?

8   A.   Rick was a -- in the Guard Recruiting Assistant Program.

9   He was an RA, is what they called them.  So recruiter's

10  assistant.  So that's what they called them.  They called them

11  RA.  So I'll probably be saying that from here on out.  He was

12  an RA.

13  Q.   When he worked as an RA with you, can you estimate about

14  how long a period of time it was?

15  A.   From probably -- it was a long time ago.  I'm not quite

16  sure when the G-RAP program started.  So I couldn't give you an

17  accurate guess, but when it started.

18  Q.   But not in terms of dates, but was it months or years --

19  A.   It was a couple of years, yeah.

20  Q.   Okay.  And --

21  A.   Probably more than a couple.  Again, I'm not too sure when

22  the life of the G-RAP program began and ended.

23  Q.   Okay.  But at least a couple of years --

24  A.   Yes.

25  Q.   -- that you worked with him?

1      And during those couple of years that you worked together

2    while he was in G-RAP, can you estimate roughly how many

3    potential recruits he talked to?

4    A.   I only know the recruits that he brought to me, but I could

5    speculate that he usually takes anywhere between ten -- you

6    have to talk to ten to 20 people, maybe a little bit more, in

7    order to find a qualified and an interested applicant to join

8    the California Army National Guard.  So he probably talked to

9    hundreds.

10   Q.   Stop there.  That estimate that you gave about how many

11   people you have to talk to to get one qualified enlistment, is

12   that based on your own experience?

13   A.   Yes.

14   Q.   And how many years did you work in recruiting?

15   A.   Eight years.

16   Q.   Okay.  And was that pretty consistent, the number of people

17   that you have to talk to?

18   A.   Yeah.  You have to talk to a lot of people.

19   Q.   Okay.  And was your area of work as a recruiter always the

20   same?

21   A.   Yes.  I had the same zip codes.  That was how recruiters --

22   the way the recruiters work, they're assigned some zip codes

23   and given a territory, like a sales territory, if you think

24   about it that way.  And that's how recruiting is done.  You

25   don't go out of your territory because then you would be -- you

1   would be stealing from your fellow recruiters.

2   Q.   Okay.  And you said that you remember Rick Sihner

3   introducing recruits -- potential recruits to you at some point

4   during the G-RAP program?

5   A.   Yes.

6   Q.   Can you estimate about how many, roughly?

7        More than ten?

8   A.   Yes.

9   Q.   More than 50?

10  A.   Yes.

11  Q.   More than 100?

12  A.   Yes.

13  Q.   Now, out of that 100 potential recruits that Mr. Sihner

14  introduced you to, did they all sign up?

15  A.   No, they did not.  At various stages during the process of

16  determining if they're qualified or not, people just washed out

17  for this, that or the other.  Law violations.  You know, bad

18  physical histories.  Any number of different issues -- personal

19  issues that people come across that make them unqualified to

20  join the military.

21  Q.   So fair to say that Mr. Sihner did not have a 100 percent

22  success rate with people he introduced?

23  A.   No.  That wasn't the recruiting assistant's job.  The

24  recruiting assistant's job was to get you a prequalified

25  applicant, and then it was the responsibility of the recruiter

1  to take them the rest of the way.

2  Q.  And did you ever keep any statistics on how many of his

3  people went all the way through?

4  A.  No.

5  Q.  But some did?

6  A.  Yes.  A lot of them did.  I can't give you an approximate

7  answer because I don't have that information.  It has been a

8  long time.  But he did put in a lot of people.

9  Q.  Okay.

10 A.  Not necessarily with me.  There were other recruiters.  The

11 recruiting assistant, one of their responsibilities -- or one

12 of their purviews is to be able to choose a recruiter to work

13 for them in order to try and bring an applicant in to the

14 military.

15 Q.  What other recruiters worked in your office during the

16 period that Mr. Sihner was working as an RA?

17 A.  Again, with RAs, they go everywhere to get their leads.

18 They're not bound by the same restrictions as territories that

19 recruiters have.  So if he found prospects in different areas,

20 then he could bring them to different recruiters.

21 Q.  How many other recruiters -- uniformed recruiters were

22 working in -- let me back up a bit.

23      You worked at the Yuba City Armory; is that right?

24 A.  Yes, that's correct.

25 Q.  Is that your only place that you worked as a recruiter?

14

1    A.   Yes.

2    Q.   Now, did you go out to job fairs and things also?

3    A.   Absolutely.

4    Q.   But your place of duty was the Yuba City Armory?

5    A.   It was the Yuba City Armory and the surrounding areas.

6    There is Yuba City.  There is Colusa.  At one time I had

7    Oroville.  I mean, it was a breathing thing.  Our territory

8    changed all the time.

9    Q.   Okay.  But your actual office?

10   A.   The business office was on 210 B Street in Yuba City, yes.

11   Q.   And you never worked -- did you ever work in the Arden

12   recruiting office?

13   A.   Yes.  Well, not Arden, no.

14   Q.   What about in Sacramento?

15   A.   Yes.  That's where our -- each of the recruiting teams has

16   a central location or a boss, and we have to meet up with the

17   boss.  And our boss was team Roseville.  So the Roseville and

18   surrounding, we had about eight recruiters that worked with us.

19   Q.   Okay.  So did you have to go to the Sacramento main office

20   for meetings sometimes?

21   A.   Yes.  Every week.  Approximately every week.

22   Q.   Okay.  But did you ever do recruiting -- meeting with

23   potential recruits at the Sacramento office?

24   A.   I did.  I did that to help my fellow recruiters.

25   Q.   Okay.

1    A.   Sometimes a fresh set of eyes working on a project helps

2    people get, you know, their mission made.

3            THE COURT:   I think the question -- the thrust of the

4    question more is what was your main office?

5            THE WITNESS:   My main office was 210 B Street, Yuba

6    City.

7            THE COURT:   Okay.  Go ahead.

8    BY MR. BEEVERS:

9    Q.   Would that be maybe 95 percent of your time?

10   A.   Yes.   In the Yuba City and surrounding areas, depending on

11   what our territories were at the time.

12   Q.   Okay.  So you weren't in the office all the time?

13   A.   No.  No.  No.

14   Q.   Now, during your time working in the Yuba City Armory, what

15   other uniformed recruiters were working in that office?

16   A.   There were -- there were a couple of other recruiters, yes.

17   Q.   Do you remember any names?

18   A.   Yes, I do.  One was Sergeant Kevin Jones.

19   Q.   Okay.

20   A.   And Staff Sergeant Marylou Sandoval.

21   Q.   Did you ever see --

22   A.   And Sergeant Terry Reitzel, R-e-i-t-z-e-l.

23   Q.   Now, did you ever see Mr. Sihner introduce potential

24   recruits to any of the other recruiters?

25   A.   Yes, I did.

16

1    Q.   And you wouldn't know if any of those were successful?

2    A.   I do not.  I pretty much watched out --

3            THE COURT:  No question.  Stop.  Wait for a question.

4    BY MR. BEEVERS:

5    Q.   When you saw -- did you ever see Mr. Sihner speak to

6    potential recruits who were in the office?

7    A.   Yes.

8            THE COURT:  In the armory, you mean?

9    BY MR. BEEVERS:

10   Q.   Sorry.  In the armory.

11   A.   Yes.

12   Q.   And did he speak to any recruits other than just the people

13   he introduced to you?

14   A.   Yes, he did.

15   Q.   What kinds of things did he say to those people?

16   A.   Well, he would give them a MEPS briefing, or he would talk

17   to them about features and benefits of the California Army

18   National Guard.

19   Q.   Okay.  Now --

20   A.   Sometimes -- Oh, right.

21           THE COURT:  Wait for the question.

22   BY MR. BEEVERS:

23   Q.   I'll ask more.  We'll get there.

24   A.   Sorry.

25   Q.   It's okay.  The questioning rules are strict.

1      Did Mr. Sihner ever work on potential recruits' files after

2   those people had already signed up for the Guard, but before

3   the people actually shipped off to the service?

4   A.   Not to my knowledge.

5   Q.   Did he ever go to MEPS briefings with people?

6   A.   He did take people down to MEPS.  Yes.  He took his own RAs

7   down to MEPS at times -- sometimes.

8   Q.   His own RAs?

9   A.   His own applicants, his own recruits, his own people,

10   sometimes he did take them down to MEPS.

11   Q.   So as you understood, if he brought someone in to you, did

12   he usually follow through with those people?

13   A.   Yes.

14   Q.   Did you ever ask him to do anything to help people that

15   were not connected -- let me ask it this way.  Did he help with

16   other matters in the office in general?

17   A.   Other than his RA duties, no.  Sometimes I would have a

18   hard sale or have a hard time trying to talk to an applicant

19   about joining the National Guard, so I would ask Rick to talk

20   to them.

21   Q.   Okay.

22   A.   I drew upon his expertise when I was -- sometimes -- you

23   know, some people don't say yes all the time.  They don't just

24   walk in the door.  You have to talk to them.

25      And some people they're not quite, you know, comfortable

18

1   with everything.  So on occasion I would ask Rick to come in

2   and talk to one of my applicants, yes.

3   Q.  Okay.  How often -- and when he talked to some of the other

4   applicants, did he seem to get results?  Did it work?

5   A.  Occasionally.

6   Q.  Did you ever see him talk -- do the same sort of assisting

7   for other recruiters' potential recruits?

8   A.  I believe he did, but I'm not sure.  I mean, I wasn't there

9   so...

10  Q.  You weren't there all the time; is that right?

11  A.  Correct.

12  Q.  And did he have a key to all your office files?

13  A.  Rick did not.

14  Q.  Who had keys to your office files?

15  A.  Sergeant Sandoval, Specialist David Greybeck and Sergeant

16  Kevin Jones.  And the armory custodian.

17  Q.  When Mr. Sihner brought recruits to you -- to introduce to

18  you, did he ever bring any paperwork with him as well?

19  A.  He would advise his applicants to bring paperwork, but he

20  didn't bring paperwork.  No.

21  Q.  What kinds of paperwork would the applicants bring?

22  A.  Birth certificate, social security card, picture ID card,

23  high school diploma.  Yeah.  That kind of stuff.

24  Q.  Was it often that Mr. Sihner would introduce the potential

25  applicant -- well, let me ask it differently.

1    When Mr. Sihner introduced an applicant to you, do you know

2    how they got to the armory?  Could you see them come in?

3    A.   They walked up the path to the armory.

4    Q.   Okay.  But you couldn't see who drove?

5    A.   No.

6    Q.   Did you ever have to drive potential recruits or pick up

7    potential recruits?

8    A.   All the time.

9    Q.   And are you aware of Mr. Sihner ever driving potential

10   recruits at any time in any process?

11   A.   Can you elaborate?

12   Q.   Did you ever see Mr. Sihner give any potential recruits

13   rides for anything?

14   A.   His RAs -- some of his RAs, he would bring in himself.

15   Q.   And --

16   A.   And those RAs -- or excuse me.  The potential applicants

17   that they bring in, the people that he was working, he would

18   give them rides sometimes, if they didn't have a car.

19   Q.   Okay.  And that wouldn't be just the first time -- or would

20   that be just the first time the potential recruit came to the

21   armory?  If you know?

22   A.   The way the process works --

23   Q.   I'm not asking about that.  I'm asking if you ever saw him

24   give people rides.

25   A.   Yes, I did.

1    Q.   Did you ever ask him to give any potential recruits a ride

2    in general?

3    A.   No.  Well, sort of.  He was allowed to work the people that

4    he was prospecting.  But if I had an appointment with a

5    potential recruit for the California Army National Guard, I

6    would go and pick them up myself or they would drive in

7    themselves.

8    Q.   Okay.  Do you know a Captain Markham?

9    A.   I do.  Captain Jason Markham.  Yes.

10   Q.   What was his job at the time Mr. Sihner worked in G-RAP, if

11   you know?

12   A.   He was what they called -- he was a technician.  He was a

13   title 10 or a GS worker.  He was a GS10.  He was the company

14   commander for, I believe it was, Alpha Company 297 Support

15   Battalion.  And he worked there as a full-timer, as a

16   technician.

17   Q.   He wasn't actually a recruiter?

18   A.   No, he was not.  To my knowledge he was not.

19   Q.   As far as you know?  And is that --

20   A.   That is a true statement, yes.  He wasn't in my recruiting

21   command.  He wasn't a recruiter.

22   Q.   Okay.  And did he work in your armory building?

23   A.   Yes.  He did work in the armory building.

24   Q.   Okay.  And did you ever have any recruiting contact with

25   Captain Markham?

1   A.   Occasionally.   Yes.   I would use Captain Markham when --

2   there are two types of applicants.   One of them is somebody who

3   has been in the military already.   We called them "prior

4   service."   And I utilized Captain Markham because I needed an

5   officer to swear them in to the California Army National Guard.

6        Everybody who enlists in the military has to be sworn in by

7   an officer.   So yes, I did utilize Captain Markham from time to

8   time.

9   Q.   When Mr. Sihner worked as a recruiting assistant, did he

10  wear civilian clothes?

11  A.   Yes, he did.

12  Q.   And were you ever told what the -- let me ask it

13  differently.   Did your commanders ever tell you what the rules

14  of the G-RAP -- what any of the rules of the G-RAP program

15  were?

16             MS. LYDON:   Objection.   Hearsay.

17             THE COURT:   Just "yes" or "no."   Don't over

18  elaborate.

19       The question is:   Did your commanders ever tell you what

20  any of the rules of the G-RAP program were?   Just "yes" or

21  "no."

22             THE WITNESS:   Yes.

23             THE COURT:   All right.   There you go.

24  BY MR. BEEVERS:

25  Q.   When Mr. Sihner was working as -- under the G-RAP program

1    on potential recruits which he introduced to you, did he

2    continue being involved with that potential recruit until they

3    shipped?

4    A.   Yes.  Well, occasionally.  Sometimes he couldn't make it to

5    be there.  On the whole he did, but it was pretty much my

6    responsibility at that point to take care of the potential or

7    enlistee at that time.

8    Q.   Did you ever see his potential recruits filling out any

9    paperwork -- any Guard paperwork with Mr. Sihner?

10   A.   No.  Well, sometimes.  Sometimes he would do his -- he

11   would -- he would be there while they were doing their

12   paperwork for me.

13   Q.   Okay.  And were you aware that the G-RAP program required

14   Mr. Sihner to type some information into a computer?

15   A.   I am aware of that, yes.  That's pretty much -- yes.

16   Q.   Did that happen at your office?

17   A.   No, it did not.

18   Q.   Do you have any independent knowledge of how Mr. Sihner got

19   the personal information from the recruit?

20   A.   He probably talked to them.

21           THE COURT:  Don't speculate.  Don't guess.

22   BY MR. BEEVERS:

23   Q.   I'm asking you if you witnessed getting personal

24   information from any of the potential recruits ever?

25   A.   Yes, I did.

1   Q.  Did you ever sell any personal information to Mr. Sihner?

2   A.  I did not.

3   Q.  Not?  Right?

4   A.  I did not.  Clearly.  Yes, I did not.

5   Q.  Now, you're not in the National Guard now, right?

6   A.  No, I am not.

7   Q.  Okay.  And were you discharged?

8   A.  Yes, I was.

9   Q.  What's the character of your discharge?

10  A.  General, Under Honorable.

11       THE COURT:  General what?

12       THE WITNESS:  General Under Honorable Conditions.

13  BY MR. BEEVERS:

14  Q.  That's not a bad conduct discharge and not an honorable

15  discharge?  It is in the middle, right?

16  A.  It is general under Honorable Conditions.  So it is a

17  general discharge under Honorable Conditions.  There's a lot of

18  different characterizations.

19  Q.  How many different kinds of discharges are there?

20  A.  About five.

21  Q.  And General Under Honorable conditions is?

22  A.  I can explain it.

23  Q.  Can you list what the discharges are, which is the best and

24  which is the worst?

25  A.  Honorable Discharge is the best.  Then there is General

1    Under Honorable, which means you had a problem when you got

2    out, but they still didn't think it was bad enough for it to be

3    something that would, you know, give you a Bad Conduct

4    Discharge.  And then there was medical discharges and retiring

5    and bad conduct.

6    Q.  Now, the circumstances of your discharge involved -- you

7    admitted -- in your discharge you admitted attempting to

8    talk -- the circumstances of your discharge, can you explain

9    what they were?

10   A.  Yes.  I made a poor choice.  I got drug tested, and I lost

11   my job.  And during that process, while I was trying to --

12   while I was trying to -- I tried to talk my way out of it.  I

13   tried to appeal to the sensibilities of the recruiters that

14   were testing me.

15   Q.  The test is like a urinalysis test?

16   A.  Yes.  I panicked while I was in there.  I tried to talk my

17   way out of it.  I was scared.

18   Q.  And do you remember exactly what you said to try to talk

19   your way out of it?

20   A.  Yes, I do.

21   Q.  What did you say to try to get out of it?

22   A.  I would plead -- there were three different people I talked

23   to when that happened.  And I just pleaded with them to please

24   let me, you know, fake the test.

25      I knew I was -- I knew I was going to be dirty, and I was

1    scared.  And I told them:  I'll do anything.  Just please allow

2    me to, you know, fake this test so I can stay in the military.

3    Q.  Okay.  And you said "dirty."  That means there is some

4    drugs in your urine?

5    A.  Yes.  Yes.  I got out of the military because I failed a

6    drug test.  I lost my job.  I lost my career.  I lost my

7    family.  It was pretty tough.

8    Q.  And --

9    A.  And I have -- I can never wear a uniform again.  I won't be

10   able to go back in probably.

11   Q.  And the fear of losing your job, is that why you tried to

12   talk the other Guard members into letting you change the test?

13   A.  Yes.  I was scared.  I knew they had -- when I was going to

14   take the test, I knew I was going to fail.  But I did not want

15   to disobey a direct order because that's worse than giving them

16   a bad test.

17        But I panicked.  And I tried to appeal to their

18   sensibilities.  And, you know, their being good NCOs -- it was

19   something I shouldn't have done.  I shouldn't have put them in

20   that position.  As a result, I got help.  I got better.  I got

21   out.  I took my lumps and got out of the service, and I moved

22   on.

23   Q.  One other question.  When you did -- during the

24   investigation that resulted in your being put out, were you

25   interviewed by MPs?

1    A.   I was interviewed by CID, the Criminal Investigation

2    Division of the Army.

3    Q.   Okay.  Were you in custody?

4    A.   I was not.

5    Q.   No.  And did they record on audiotapes that interview?

6    A.   Yes, they did.  I told them everything.  There is no point

7    in -- the only way out is through.

8         When you make a mistake like that, you have to just accept

9    the consequences and move on.  And that's exactly what I did.

10        MR. BEEVERS:  One moment.

11        (Cocounsel confer.)

12        MR. BEEVERS:  No other questions.

13        THE COURT:  Cross-examination.

14                        CROSS-EXAMINATION

15   BY MS. LYDON:

16   Q.   So your testimony is that Sihner brought potential soldiers

17   to you?

18   A.   Yes.

19   Q.   Not ever the other way around?

20   A.   No.

21   Q.   You never gave leads to Sihner?

22   A.   I never gave leads to anybody.  But no, I did not give

23   leads to Sihner.

24   Q.   And all the potential soldiers that Sihner provided you

25   were people that he met outside the recruiting station?

1    A.   Yes.

2    Q.   He met them all out in the world?

3    A.   I don't know where he met them, but yes, outside of the

4    recruiting station.

5    Q.   He would meet them in malls?

6    A.   He would meet them in all kind of places.

7    Q.   You claim that every nominee Sihner got paid for through

8    G-RAP he brought in?

9    A.   To my knowledge, yes.

10        MR. BEEVERS:   Objection.

11        THE COURT:   He said to his knowledge.   Go ahead.

12        THE WITNESS:   I misspoke when I said that.   He brought

13   me applicants.   He did not get paid for all of them, no,

14   because not all of them enlisted into the military.

15   BY MS. LYDON:

16   Q.   After Sihner brought you applicants, typically he would

17   stay involved with those applicants?

18   A.   Yes.

19   Q.   But he wouldn't work on their files, you testified?

20   A.   Correct.   He wouldn't be doing their paperwork.   That was

21   my job.

22   Q.   Sihner, you testified, didn't do other jobs around the

23   office aside from his RA duties?

24   A.   Like in my office?

25        I don't know what he did when he wasn't in my office.

1    Q.   To your knowledge, Sihner didn't do other jobs around the

2    office, outside from his RA duties, sir?

3    A.   He did his RA duties, that's correct.  I mean, he cleaned,

4    you know.  Maintained the office, you know.  Occasionally, you

5    know -- you know, swept, made the office look pretty.

6    Q.   But he didn't work on files behind the scenes?

7    A.   No.  If he did -- if he was going to be working on files,

8    or if I had to talk to him, I would be the one working on the

9    files.  And I would ask him for his advice.  So I guess he did

10   work on files, so I misspoke earlier.

11   Q.   He didn't work on files without you?

12   A.   He did not work on files that were not his without me.

13   Q.   He didn't work on files without you?

14   A.   Correct.  Well, files in my office.

15   Q.   To your knowledge he did not work on files without you

16   there?

17   A.   Correct.

18   Q.   You would see Sihner, you testified, walking with potential

19   recruits that he brought in up the path to the armory, right?

20   A.   Occasionally.

21   Q.   They would walk in together?

22   A.   Occasionally.  There's a system that G-RAP has for when

23   people bring in.  I have to explain it to you so that we get a

24   better understanding of how they're brought to my attention.  I

25   really need to tell you how that happens.

29

1   Q.   The defense will have a chance to ask you questions.   My

2   question is, you saw Sihner walking with potential recruits up

3   the path into the armory together?

4   A.   Yes.   Not all of them, just a few of them.

5   Q.   Who?

6   A.   I couldn't tell you names.   It was a long time ago.

7   Q.   You also claimed that you saw Sihner giving rides to

8   recruits that he introduced you to?

9   A.   Correct.

10  Q.   Who?

11  A.   People that he was working with.   I do not know.   I don't

12  know all of their names.

13  Q.   And on the whole Sihner stayed involved with the recruits

14  that he brought to you until they shipped?

15  A.   Most of the time, yes.

16  Q.   Sihner got credit under G-RAP for bringing in a Mr. John

17  Russo.   Do you claim John Russo came into the Guard due to

18  Richard Sihner?

19  A.   I do not.

20  Q.   You do not?

21  A.   No.   I don't know if he got claimed for him or not so...

22  If that was one of his people, then he got credit for it.

23  Q.   And you were John Russo's recruiter?

24  A.   Yes.

25  Q.   So you got credit for it too?

1    A.   I did.

2    Q.   How much do you get paid per recruit?

3    A.   I did not get paid per recruit.  In the AGR we get a flat

4    money every month.

5    Q.   You don't get any additional financial incentive for

6    bringing in --

7    A.   They may have had a program in place, like 100 bucks, at

8    times to reward the recruiters for doing a good job.  I can't

9    recollect.  But they did have an incentive, but it was a small

10   one.  G-RAP did.  Not the Army.

11   Q.   So in the Army, however, you did get paid a commission for

12   bringing in recruits?

13   A.   I did not get paid a commission by the California Army

14   National Guard, no.

15   Q.   Did you in any way receive additional compensation due to a

16   recruit joining the Army -- the California National Guard?

17   A.   No.  Additional compensation, no.  It was our mission.  We

18   were given a mission.  And that's what we got paid to go do.

19   So if I am an E7, and I'm working in my office, and there is

20   another E7 over here, and he's working in his office, the pay

21   is all the same.  Based on time and grade.  There is a variable

22   there, but essentially we get paid the same.

23   Q.   So aside from $100 bonuses perhaps, your pay didn't depend

24   on how many soldiers you enlisted?

25   A.   No.  I could have not enlisted anybody and I would still

1   get paid.

2   Q.   The same amount?

3   A.   Correct.   I just have to do a lot of remedial training if I

4   didn't make my mission.

5   Q.   So you said that if John Russo was someone that Sihner got

6   credit for through G-RAP, it is because Sihner brought him in?

7   A.   Yes.

8   Q.   Well, John Russo told you that a female soldier named

9   Callie Vanda actually referred him to the Guard and that she

10  should get credit through G-RAP, didn't he?

11  A.   I don't remember.

12  Q.   And you told Callie Vanda that she could receive G-RAP

13  bonuses for referring potential soldiers, a thousand when they

14  signed and a thousand when they enlisted, didn't you?

15  A.   That was how the program worked at the time, yes.

16  Q.   And that's what you told Callie Vanda?

17  A.   I told her that if she put people in the computer, that

18  that's usually the way it flows.   I explained the G-RAP program

19  to her.

20  Q.   Well, Callie Vanda didn't get paid for John Russo, did she?

21  A.   I do not know.

22  Q.   Richard Sihner got paid.

23  A.   If Richard Sihner got paid, then Callie Vanda obviously did

24  not.

25  Q.   Sihner got paid for bringing in Brad Donoho to the National

1    Guard.  You were Donoho's contract recruiter.

2        Do you claim that Sihner brought Donoho to the National

3    Guard and introduced him to you?

4    A.  He must have put him in the G-RAP system, and that's how I

5    get my information.  That's how I get my information for the

6    leads, is from -- the leads that potential RAs bring in, they

7    have to put them in the computer.  And then their information

8    gets sent to me.  That's how I meet them.

9    Q.  My question is, do you claim that Sihner brought in Brad

10   Donoho and introduced him to you?

11   A.  No, I do not.

12   Q.  Do you claim that Sihner brought Brad Donoho to the

13   National Guard?

14   A.  I don't know if he brought him to the National Guard.  He

15   put him in the computer before I worked with Brad Donoho.

16   That's what I'm saying.  I'm saying that -- he put them in the

17   computer, and that's how I contacted Brad Donoho.  That's what

18   I'm saying.

19   Q.  Do you recall Wilson Tyler enlisting in the National Guard?

20   A.  Yeah.  The name sounds familiar.

21   Q.  Do you remember that he was friends with your then

22   stepdaughter Amanda Plant?

23   A.  I do.

24   Q.  Do you remember he came into the Guard with Amanda for the

25   first time?

1    A.   Yes, he did.

2    Q.   How did Sihner get paid for that?

3    A.   I don't know.

4    Q.   Do you have to sign off on Sihner's G-RAP bonuses?

5    A.   I am not involved in any way other than being the recruiter

6    that he refers his people to, so no.

7    Q.   But you're notified when Sihner enters someone in the G-RAP

8    system?

9    A.   Correct.   Then I talk to the prospect.

10   Q.   In that order?

11   A.   Yes.

12   Q.   Do you remember Alex Hogan enlisting in the National Guard?

13   A.   Vaguely.

14   Q.   Do you remember walking into his pizza parlor with a woman

15   and one of you sliding your card across the table and talking

16   to him about the Guard?

17   A.   Yes.

18   Q.   Any idea why Richards Sihner claimed that he had gone to

19   the pizza parlor and talked to Alex about the Guard?

20   A.   No.

21   Q.   Do you remember Christopher Cafaro enlisting in the Guard?

22   A.   I do remember Chris Cafaro.

23   Q.   Do you remember that he's a prior service person who did

24   his research online, came in and talked to you?

25   A.   I remember -- I remember interviewing him, yes.

34

1 Q. Do you know that Richard Sihner got a bonus for Cafaro

2 joining the Guard?

3 A. I did not know that he got a bonus for him, no.

4 Q. Your testimony a few minutes ago was that everyone that

5 Sihner got a bonus for, he brought into the Guard?

6 A. That's the way the G-RAP system works, to my knowledge.

7 Q. But he shouldn't have got a bonus for Cafaro, right?

8 A. That is correct.

9 Q. Do you remember promising Cafaro a $1,000 bonus for joining

10 the Guard?

11 A. No.  I offered more than that.

12 Q. How much more?

13 A. The prior service bonus at the time is based off the amount

14 of his enlistment.  I do not recall the number, but I think it

15 was more than a thousand bucks.

16 Q. Cafaro never got that bonus, did he?

17 A. No, he did not.

18 Q. Do you recall Anthony Juarez, a young boxer and MA fighter?

19 A. Yes.

20 Q. Did Sihner bring him to you?

21 A. I don't know.

22 Q. You said you recall Anthony Juarez.

23 A. I remember working with people.  How they got brought to

24 the dance is a little fuzzy.

25 Q. But if Sihner got paid for recruiting Anthony Juarez -- or

1    referring Anthony Juarez, he should have brought him to you,

2    right?

3    A.   Correct.  Or I would have gotten notified.  The way it

4    works is I get notified, and then I notify the applicant.

5    Sometimes he brings them in.  Sometimes he doesn't.

6    Q.   But he's always the first contact with the recruit?

7    A.   Yes.  He's supposed to be the first contact with the

8    recruit, and then he puts their information in the computer.

9    And that's how the information gets brought to me.

10   Q.   Do you remember Joseph Carr?

11   A.   The name sounds familiar.

12   Q.   And if Sihner got paid through for G-RAP for Joseph Carr,

13   your testimony is that is because Sihner brought him in?

14   A.   It's because Sihner put the information in the computer,

15   and I was notified.  And then I notified the prospect.

16   Q.   By putting the information in the computer, Sihner is

17   saying that he referred him, he brought him in?

18           MR. BEEVERS:  Objection.  Foundation, if this witness

19   knows about how the computer works.

20           THE COURT:  Overruled.

21           THE WITNESS:  Okay.  Can you please repeat that?

22   BY MS. LYDON:

23   Q.   By putting a recruit's information in the computer, into

24   G-RAP, Sihner is saying that I referred him, I brought him in?

25   A.   That is correct.

36

1    Q.   Do you remember Lee Garman?

2    A.   I do remember Lee Garman.

3    Q.   Prior active duty Army, the Army Reserves, then researched

4    California National Guard on his own and went to the recruiting

5    station and met with you?

6    A.   I remember meeting with Lee Garman, yes.

7    Q.   Sihner shouldn't have gotten a bonus for Lee Garman, right?

8    A.   If he put him in the computer, then yes.

9    Q.   But Sihner didn't bring Lee Garman to the Guard, did he?

10   A.   He may not have brought him to my office, no.

11   Q.   Lee Garman brought himself to the office, didn't he?

12   A.   That is correct.

13   Q.   He reached out to you entirely on his own, didn't he?

14   A.   He did call me, yes.

15   Q.   And so Sihner shouldn't have gotten a bonus for him, right?

16   A.   That is correct.

17   Q.   Do you recall recruiting Anthony Weber?

18   A.   Again, familiar, but I'm more familiar with faces than I am

19   with names.

20   Q.   Do you remember Sihner giving you that lead?

21   A.   Say again?

22   Q.   Did Sihner give you the Austin Weber lead?

23          THE COURT:   Austin or Anthony?

24          MS. LYDON:   Austin.

25          THE COURT:   You said Anthony.

1          THE WITNESS:  It was a long time ago.  I don't know.

2     BY MS. LYDON:

3     Q.   By the way, do you remember telling Austin Weber not to

4     disclose he had a history of childhood asthma?

5     A.   No.  I would never tell anybody to do that.  I told them

6     not to lie when they go down to MEPS.  You lie, it's on you.

7     It is not on me.

8          There was a part on the 2807 that every recruit signed that

9     says that they were not coerced by their recruiter before they

10    go down to MEPS -- or before they take their physical.

11         We send that paperwork with them when they go down there.

12    I never would tell anybody to lie.

13    Q.   Did you have a mug on your desk featuring a 1940's GI Joe

14    character holding up a sign?

15    A.   No, I did not.

16    Q.   Did you have a mug on your desk featuring a soldier holding

17    up a sign?

18    A.   No.  Not to my recollection.  Not a mug.

19    Q.   Did you have something on your desk featuring a soldier

20    holding up a sign?

21    A.   No.  Not a mug.  I had a picture of a soldier holding a

22    mug, but I did not have a mug.

23    Q.   What were the words on that picture?

24    A.   "How about a big nice cup of shut the fuck up."

25         I did that because I had other duties in the armory, other

1    than being a recruiter.

2           THE COURT:  All right.  Let's take a break.  Take ten

3    minutes.

4         During the recess all admonitions apply.  Please do not

5    discuss the case with anyone.  Do not discuss the case amongst

6    yourselves.  No independent investigation or research.

7         We'll come back in about ten minutes.

8         (Off the record at 11:00 a.m.)

9         (Back on the record at 11:15 a.m.)

10          THE CLERK:  You may remain seated.  Court is again in

11   session.

12          THE COURT:  Bring in the jury.

13        (Jury seated.)

14          THE COURT:  All right.  All jurors are present.  All

15   parties are present.

16        Ms. Lydon, you may continue your cross-examination.

17   BY MS. LYDON:

18   Q.  When we took our break, we were talk about that picture on

19   your desk.

20   A.  Yes.

21   Q.  What did you do with that picture when Austin Weber started

22   telling you about his childhood history of asthma?

23   A.  He never told me about his childhood history of asthma.

24   There is a form you fill out, and on the form it asks if he had

25   asthma and he said no.

1   Q.  Well, before that, in your office, he started telling you

2   about his picture of -- his history of childhood asthma, and

3   you held up that picture, didn't you?

4   A.  I did not.

5   Q.  If Austin Weber said that, is it your testimony he would be

6   lying?

7          MR. BEEVERS:  Objection, Your Honor.  Calls for

8   speculation about another person's thoughts.

9          THE COURT:  Sustained.  Sustained.

10  BY MS. LYDON:

11  Q.  How did checking that "No" box on the childhood asthma

12  question on the form turn out for Mr. Weber?

13  A.  I don't know.

14         MR. BEEVERS:  Objection.  Foundation.

15  BY MS. LYDON:

16  Q.  Did you know that Mr. Weber was kicked out of boot camp for

17  failing to disclose a history of asthma?

18         MR. BEEVERS:  Objection.  Relevance.

19         THE COURT:  Sustained.

20  BY MS. LYDON:

21  Q.  You testified earlier that Mr. Sihner shouldn't have gotten

22  a bonus for bringing in Lee Garman.

23      Do you remember that?

24  A.  I do.

25  Q.  You also testified that you get a notification every time

1    that Sihner claims someone in the G-RAP system, correct?

2    A.   Yes.  I do.

3    Q.   And you didn't take any action when Mr. Sihner in 2008

4    claimed he deserved a bonus for Lee Garman?

5    A.   I was not -- no, I didn't.

6    Q.   Let's talk about David Ferguson.  Do you remember David

7    Ferguson?

8    A.   Refresh my memory.

9             MR. BEEVERS:  Objection, Your Honor.

10            THE COURT:  The answer is "yes" or "no."  Do you

11   remember David Ferguson?

12            THE WITNESS:  It rings a bell.

13   BY MS. LYDON:

14   Q.   Does it ring a bell as someone Sihner brought in?

15   A.   It is a long time ago.

16            THE COURT:  The answer is "yes" or "no."

17            THE WITNESS:  I do not recollect.

18            THE COURT:  There you go.

19   BY MS. LYDON:

20   Q.   But if Sihner didn't actually bring him in, he shouldn't

21   have gotten bonus through G-RAP, should he have?

22            MR. BEEVERS:  Objection.  He's not an expert in

23   G-RAP.

24            THE COURT:  Overruled.

25            THE WITNESS:  If he did not bring him in, he shouldn't

1    have gotten credit for him, yes.

2    BY MS. LYDON:

3    Q.  Did you forge a number of documents that were part of David

4    Ferguson's enlistment package?

5    A.  I'm not familiar with it because I don't remember the

6    details.

7    Q.  You don't remember whether or not you forged --

8    A.  I did not forge documents.

9         THE COURT:  Stop.  Stop.  The court reporter took down

10   none of that.  You need to let her finish her question.  You

11   let him finish his answer.

12        When you talk over each other, the court reporter is going

13   to throw up her hands and nothing is going to get recorded.

14        Start over, Miss Lydon.

15   BY MS. LYDON:

16   Q.  You do not recall whether you forged portions of David

17   Ferguson's enlistment package?

18   A.  I recall that I didn't forge any documents.  That is

19   correct.

20   Q.  Did you falsely offer Ferguson an enlistment bonus that he

21   was not entitled to receive?

22   A.  No, I did not.

23   Q.  Did you offer Ferguson an enlistment bonus?

24   A.  I don't remember the details of that particular enlistment.

25   I don't remember.

42

1        THE COURT:  Ms. Lydon, let him finish his answer.

2        MS. LYDON:  My apologies, Your Honor.

3        THE COURT:  You started to say I don't remember the

4   details of the particular enlistment.  Anything else you wanted

5   to add?

6        THE WITNESS:  Other than I never forged any documents

7   of any kind.

8   BY MS. LYDON:

9   Q.  Well, are you aware that the Guard denied Ferguson the

10  bonus and allowed Ferguson to back out of his enlistment

11  contract early because his enlist had been procured by fraud by

12  you?

13       MR. BEEVERS:  Objection, Your Honor.  Irrelevant.

14       THE COURT:  Overruled.

15       THE WITNESS:  I was not aware of that.

16  BY MS. LYDON:

17  Q.  Do you recall Michael Ungureanu?

18  A.  Ungureanu?  Yes, I do recall him.

19  Q.  Did Sihner introduce him to you?

20  A.  It is a long time ago.  Hard to say.  I can't remember.

21  Q.  But if Sihner didn't introduce him to you, then he

22  shouldn't have gotten a bonus through G-RAP, right?

23  A.  Right.

24       MR. BEEVERS:  Objection.  Calls for his opinion on

25  G-RAP.

1        THE COURT:  Overruled.

2        THE WITNESS:  Correct.

3    BY MS. LYDON:

4    Q.  Do you remember Marcus Straker?

5    A.  The name rings a bell.

6    Q.  Former Air Force.  Had an underage drinking episode while

7    in the Air Force and needed a waiver to reenlist in the Guard.

8        Do you recall Marcus Straker now?

9    A.  Vaguely.  I remember -- I worked with a lot of people, so I

10   put a lot of people in boots.  I was really good at my job.  So

11   I worked with a lot of people, a lot of names.  It was a long

12   time ago.

13   Q.  Did you work with Straker after Sihner brought him to you?

14   A.  Yes.  If I was his recruiter, yes.

15   Q.  You called Straker and told him that the window to reenlist

16   was open, didn't you?

17   A.  I did.

18   Q.  Do you recall that?

19   A.  Yes.

20   Q.  Sihner didn't call him and say that, you did?

21        MR. BEEVERS:  Objection, Your Honor.  He has no

22   foundation to know what Sihner did.

23        THE COURT:  Sustained.

24   BY MS. LYDON:

25   Q.  You were the person who called Straker and informed him.

1    that the window to enlist in the National Guard was open.  Do

2    you recall that?

3    A.   I recall calling him and telling him that, yes, I do.

4    Q.   Did you ever give Sihner potential soldiers' social

5    security numbers for purposes of claiming them in G-RAP?

6    A.   No, I did not.  That would be a violation of the HIPAA Act,

7    and that would be illegal.

8    Q.   You never gave Sihner any soldier's date of birth, social

9    security number, any other personal information?

10            MR. BEEVERS:  Objection, Your Honor.  Asked and

11    answered.

12            THE COURT:  It is compound too.  Break it down.

13   BY MS. LYDON:

14   Q.   Did you ever give Sihner soldiers' dates of birth for

15   purposes of him claiming them in G-RAP?

16   A.   I did not.

17   Q.   Did you ever give soldiers' dates of birth to Sihner for

18   any purposes?

19   A.   If they were his and he needed them.

20   Q.   Why would he need them?

21   A.   For just -- I don't know.  If they are people he's working,

22   and he got the information from them, then there is nothing

23   wrong with me giving that to him.  Does that make sense?

24   Q.   Why would he need you to give him the information if --

25   A.   Yes.  He could just call the applicant --

45

1          THE COURT:  Stop.  You interrupted her.  Let her

2      finish her question.

3          Try again, Ms. Lydon.

4          MS. LYDON:  Thank you, Your Honor.

5      BY MS. LYDON:

6      Q.  Why would Sihner need you to give him soldiers' dates of

7      birth if he had already gotten the dates of birth from the

8      potential soldiers?

9      A.  He would not.

10     Q.  So why would you give Sihner soldiers' dates of birth?

11     A.  I wouldn't.

12     Q.  Did you ever give Sihner soldiers' social security numbers?

13     A.  No, I did not.

14     Q.  You never gave Sihner any potential soldier's personal

15     information for the purpose of Sihner receiving any payments

16     from DOCUPAK?

17     A.  I did not give him any information about people so that he

18     could put it in DOCUPAK.

19     Q.  Why would every soldier who has testified in this case say

20     that they never gave their personal information to Sihner?

21          MR. BEEVERS:  Objection, Your Honor.  Irrelevant.

22          THE COURT:  Also calls for speculation.  Sustained.

23     BY MS. LYDON:

24     Q.  So you testified that you have never given social security

25     numbers to Sihner?

46

1   A.   Correct.

2           MR. BEEVERS:   Your Honor, objection --

3           THE COURT:   That's been asked and answered.

4   Sustained.

5   BY MS. LYDON:

6   Q.   You kind of have to say that, don't you, because if you had

7   given him information about potential soldiers that would be

8   conduct unbecoming of a noncommissioned officer?

9   A.   That is correct.

10          MR. BEEVERS:   Objection, Your Honor.

11          THE COURT:   Grounds?   What's the grounds?

12      Overruled.   Go ahead.   Answer will stand.

13          THE WITNESS:   Please repeat?

14          THE COURT:   The answer stands.   You said "correct."

15          THE WITNESS:   Oh, okay.

16  BY MS. LYDON:

17  Q.   Do you have any idea why Sihner told the DOCUPAK manager

18  who fired him that he had gotten soldiers' personal information

19  from the recruiter?

20  A.   I do not.   I do not know why he would say that.

21  Q.   You testified on direct examination about your discharge

22  from the National Guard?

23  A.   Yes, I did.

24  Q.   You testified that you tried to talk your way out of it in

25  the drug testing room?

1   A.   Yes, I did.

2   Q.   In fact, you tried to pay your way out of it, didn't you?

3   A.   I did not try and pay my way out of it, no.

4   Q.   Did you offer Kevin Eric a bribe to allow you to adulterate

5   your drug sample?

6   A.   No, I did not.

7   Q.   Did you tell Sergeant Eric, "I'll give you $1,000 a month

8   for a year" in the drug testing room?

9   A.   No, I did not.

10   Q.   You didn't say, "I'll pay you anything, just name your

11   price"?

12   A.   I said I would do anything, just please help me.

13   Q.   You don't recall saying, "I'll pay you anything.  Just name

14   your price"?

15   A.   No, I did not say that to him.

16   Q.   Would it refresh your recollection to look at the sworn

17   statement of Sergeant Eric?

18        THE COURT:  He didn't say he doesn't remember so it

19   wouldn't be a proper use of the statement.

20        MS. LYDON:  May I approach?

21        THE COURT:  Is this an exhibit?

22        MS. LYDON:  It is for impeachment.

23        THE COURT:  You need to ask a question first.

24   BY MS. LYDON:

25   Q.   You deny that you told Sergeant Eric, "I'll pay you

1  anything, just name your price"?

2  A.  I said I would do anything.  That's what I said.  Yes, to

3  answer your question.

4        MS. LYDON:  May I approach?

5        THE COURT:  No.  There is no reason.  He's answered

6  your question.

7  BY MS. LYDON:

8  Q.  On April 29th, 2011, you also were supervised in a drug

9  test by Matthew McDuff.

10      Did you ask him, "What would it take for you to let me have

11  some water for my bottle"?

12  A.  I did say that, yes.

13  Q.  When he said, "What are you talking about," did you say "I

14  will give you any amount of money to let me do this"?

15  A.  That is not what I said to him.  I said I would do

16  anything, please help me.  Same thing I told Eric.

17        THE COURT:  Wait for a question.

18        MS. LYDON:  The defense attorney can ask you his

19  questions.  I'm asking you questions at the moment.

20  BY MS. LYDON:

21  Q.  On May 4th, 2011, did you have an interview with Army CID

22  Agent Hernandez?

23  A.  Yes, I did.

24  Q.  You consented to the recording of that interview?

25  A.  I did.

49

1    Q.   And you took an oath?

2    A.   I did.

3    Q.   Provided a sworn statement?

4    A.   Yes, ma'am.

5    Q.   Was the oath the same as the oath that you took with your

6    hand up in court this morning?

7    A.   Similar.  I don't recall the exact verbiage.

8    Q.   After you took that oath, did you state that you pleaded

9    with observers to allow him to adulterate your urine sample and

10   even offered both observers money in exchange for allowing him

11   to adulterate the urine sample?

12   A.   I didn't say that.

13   Q.   What did you say?

14   A.   I told them that I would do anything.  I was trying to

15   appeal to their sensibilities for what happened.  I was trying

16   to get them to save my ass.

17   Q.   Their financial sensibilities?

18   A.   No.  Anything.  I was just trying to appeal to them as

19   people:  Hey, I'm getting ready to get fired, will you help me?

20   Q.   It is your testimony --

21   A.   And I pleaded --

22              THE COURT:  Stop.  Both of you are talking over each

23   other.  We're just going to stop every time you do that.  Try

24   again, Ms. Lydon.

25   BY MS. LYDON:

1  Q.  It is your testimony under oath here today that you did not

2  offer either person money to allow you to adulterate your urine

3  sample?

4         MR. BEEVERS:  Objection, Your Honor.  Asked and

5  answered.

6         THE COURT:  Sustained.  He's already answered that.

7         MS. LYDON:  One moment, Your Honor.

8         THE COURT:  Okay.

9     (Cocounsel confer.)

10         MS. LYDON:  The government has nothing further for

11  this witness.

12         THE COURT:  Redirect.

13                REDIRECT EXAMINATION

14  BY MR. BEEVERS:

15  Q.  The prosecutor asked you about Chris Cafaro.

16         THE COURT:  Put the microphone in front of you,

17  Mr. Beevers.

18  BY MR. BEEVERS:

19  Q.  The government asked you about Chris Cafaro, right?

20  A.  Yes.

21  Q.  And you gave -- you don't remember -- do you remember

22  Mr. Sihner bringing Chris Cafaro to the recruiting station?

23  A.  I don't.

24  Q.  Okay.  And you testified, when the prosecutor asked you

25  questions, that you had an opinion that Chris Cafaro should not

1    have been paid if some facts the prosecutor said were true,

2    right?

3              MS. LYDON:  Objection.  Misstates the testimony and

4    leading.

5              THE COURT:  The way you phrased it, you mean

6    Mr. Sihner shouldn't have been paid?

7              MR. BEEVERS:  Right.

8    BY MR. BEEVERS:

9    Q.  Did you give an opinion -- you testified on cross that --

10   you gave an opinion that if some facts were true, then

11   Mr. Sihner should not have been paid, right?

12   A.  That is correct.

13   Q.  Okay.  Do you have independent knowledge about all of the

14   facts involving Mr. Cafaro's enlistment?

15   A.  I don't recollect everything, no.

16   Q.  Okay.  And now did you -- now you testified that your

17   understanding of the G-RAP program is that the recruiting

18   assistant, like Mr. Sihner, has to put personal information

19   into the G-RAP computer, right?

20   A.  That is correct.

21   Q.  And you never gave Chris Cafaro's -- did you ever give

22   Chris Cafaro's information to Richard Sihner so he could put

23   that information into the computer?

24   A.  No, I did not.

25   Q.  If you could publish Government's Exhibit 8-A.

52

1       (Exhibit published.)

2    Q.   Do you remember Chris Cafaro's personal information?

3    A.   No, I do not.

4    Q.   Okay.

5    A.   I mean, it is right in front of me so I can see it.

6    Q.   Okay.  But you don't have any independent knowledge of what

7    his personal information was, right?

8    A.   No, I do not.

9    Q.   Now, if Mr. Sihner put this information in the government's

10   exhibit into the G-RAP computer, he had to get it from

11   somewhere, right?

12   A.   That is correct.

13   Q.   But he didn't get it from you?

14   A.   That is correct.

15   Q.   And your understanding of the G-RAP program is that if

16   Mr. Sihner got the information from Christopher Cafaro, then

17   Mr. Sihner would be entitled to be paid under G-RAP?

18   A.   That is correct.

19   Q.   And so when you said on cross-examination that maybe

20   Mr. Sihner should not have been paid for Chris Cafaro, were you

21   guessing?

22   A.   Yes, I was.

23   Q.   Now that you've -- if this exhibit is correct in showing

24   that Mr. Sihner put information on Christopher Cafaro into the

25   computer for G-RAP, what is your opinion as to whether he

1   should have been paid under the G-RAP program?

2   A.   He is following the guidelines of the G-RAP program.

3   Q.   So he could be paid?

4   A.   Correct.

5   Q.   Now, in your understanding of the G-RAP program, if

6   Mr. Sihner encourages someone to join the Guard, then that

7   person goes and meets with you and signs up for the Guard, but

8   never tells you that Rick Sihner was involved, is that person

9   still -- is Mr. Sihner still entitled to get paid for it?

10  A.   If he doesn't put the information in the computer before

11  they come talk to me, then no.

12  Q.   Okay.  But if Mr. Sihner put all of this information into

13  the G-RAP computer, convinced Mr. Cafaro to join the Guard, and

14  then some period later Mr. Cafaro goes and joins with you but

15  never mentions Mr. Sihner, that wouldn't affect -- then

16  Mr. Sihner is still allowed to get paid on that, right?

17  A.   As long as he talked to him and he got their information

18  and put it in the computer, then he should be deserving of the

19  award as far as I understand the G-RAP program.

20  Q.   Okay.  So your understanding was Mr. Sihner -- it wasn't

21  absolutely necessary that Mr. Sihner actually walk with the

22  recruiter -- with the potential recruit and introduce him

23  face-to-face to you in the armory in order to get paid, right?

24  A.   That is not a requirement as far as I can recollect.

25  Q.   Okay.  Do you remember ever any potential recruits coming

54

1    into the armory and saying that they had talked to any

2    recruiting assistant earlier?

3    A.  Yeah.  They say they've talked to people.  It happens.

4    Q.  Okay.  And do you remember if any of them ever showed you a

5    business card from Mr. Sihner and said that he's the one who

6    referred you?

7        Let me ask it differently.

8        Do you ever remember any potential recruit ever coming into

9    the office and saying that they had a card from Richard Sihner

10    and that person suggested they come talk to you?

11    A.  Yes.  That's probably happened.  It happened a couple of

12    times.

13    Q.  And if Mr. Cafaro had Mr. Sihner's business card, but

14    didn't show it to you, you would have no way to know whether

15    Mr. Sihner was entitled to payment under G-RAP for the program

16    or not, right?

17    A.  That is correct.

18    Q.  Now, you said once Mr. Cafaro actually enlisted, you would

19    receive some notification at some point?

20    A.  No.  I would receive notification when the RA -- if they

21    choose me, because RA's, recruiting assistants, had their

22    choice of a recruiter to work with.  They didn't have to pick

23    me.

24    Q.  So on the bottom of Government's Exhibit 8 --

25          THE COURT:  Get close to the mic.

55

1    BY MR. BEEVERS:

2    Q.   It shows on the bottom left your name?

3    A.   That is correct.   That is my name.

4    Q.   So do you remember receiving any kind of notification that

5    Chris Cafaro was associated with Richard Sihner at some point?

6    A.   Usually that happens via email.   When a recruiting

7    assistant puts information into the computer, then I receive an

8    email saying, hey, you should call them.

9        Their information is then downloaded into my recruiter

10   computer.   That's how the system worked.

11       The recruiting assistant has to put their information in in

12   order to get any credit for them at all before I even touch my

13   computer.   Because the way the G-RAP worked was they were

14   hand-in-hand with the recruiting system.   And their information

15   downloaded directly into my computer, and that's how I wound up

16   working the lead.

17   Q.   Okay.   And so that way you wouldn't have to retype all of

18   the information that Mr. Cafaro may have given earlier; is that

19   right?

20   A.   That also prevents people from trying to put them in after

21   I put their information into the computer.

22   Q.   Okay.   So if Mr. Cafaro came into the recruiting office on

23   his own, with no prior contact with Mr. Sihner and asked to

24   join the Guard, you would have signed him up right then, right?

25   A.   I would have started his paperwork.   I would have gotten

1    his essential information and put it into what we call our TRS,

2    which is a military acronym that basically means the recruiter

3    database for the prospects.

4        If that social security number comes up -- if he would have

5    come into me -- come in, and then Rick tried to put him in

6    after I already put his information in the computer, then it

7    would lock Rick out and Rick would not get paid, or any other

8    recruiting assistant, for that matter.

9        If they come and talk to me first, I put their information

10   in the computer, it locks out every RA in California.  Nobody

11   can get credit for him.

12   Q.   Okay.  And was that your general practice, when a person

13   walked into the Guard office and had never had any contact with

14   any recruiting assistant, would you put their information into

15   your computer right away?

16   A.   Yes, I would.  That's how we get credit for doing our work.

17   That's how we got credit for doing our work.

18   Q.   And you wanted to get credit because you didn't want to do

19   remedial training?

20   A.   You don't want -- you have to validate the appointment, and

21   the only way you can validate the appointment is by putting

22   their information into the computer.

23   Q.   Okay.  And if you didn't put it in the computer, were there

24   other recruiters in your office who might get credit for that

25   person -- that recruit?

57

1    A.   If they put them in the computer before me, yes.

2    Q.   Okay.  So you had an incentive to put a walk-in, potential

3    recruit, into the computer right away?

4    A.   Yes.

5    Q.   And based on your recollection, you did that with all the

6    people that walked in who had no recruiting assistant

7    connection?

8             MS. LYDON:   Objection.  Leading.

9             THE COURT:   Overruled.  Go ahead.  You can answer.

10            THE WITNESS:   If I met them at the office, yes.

11   BY MR. BEEVERS:

12   Q.   Now, did you ever have -- now, what if someone -- what if a

13   potential recruit came in with a business card from Richard

14   Sihner, would you still put their name into the computer right

15   away?

16   A.   No.   If any RA -- or if any prospect came to talk to me and

17   they had an RA, I would ask them if the RA has already gotten

18   credit for them.

19   Q.   Would you ever call the RA?

20   A.   That is not my job.

21   Q.   Okay.

22   A.   Sorry.

23   Q.   Okay.  And would you wait a little while to make sure the

24   RA could put it into the computer?

25   A.   If the prospect wanted to enlist right away, then I would

1  put them right in there.  If they're in my office, then I put

2  them right in the computer.

3  Q.  Okay.  Now --

4        THE COURT:  Can you explain that?

5     Even if they had a card from an RA, you would still put

6  them in?

7        THE WITNESS:  No.  I would tell them to go talk to

8  their RA.  That's what I'm saying.

9        THE COURT:  Let me try to clarify.

10    This record says:  Date Created August 19th, 2009.

11    Do you see that in the bottom right-hand-corner?

12        THE WITNESS:  Yes, sir.

13        THE COURT:  If someone had come in -- let's say

14  Cafaro, just hypothetically.  If he had come in and talked to

15  you on August 17th, so if he had come in two days before, okay,

16  just walked into the armory, and said that I want to enlist,

17  but he had a card from someone, from an RA, what would have

18  been your normal procedure under those circumstances?

19        THE WITNESS:  I would have asked the prospect if he

20  had talked with his RA about getting credit for him first.

21        THE COURT:  Okay.  If he said, "I just got this guy's

22  card," then what would you do?

23        THE WITNESS:  I would ask him to call.

24        THE COURT:  You wouldn't enter his information in your

25  computer then at that point?

1          THE WITNESS:  Correct.

2          THE COURT:  Because if you entered your information --

3     his information in your computer, that would lock out someone,

4     an RA, in the G-RAP program?  That's what you're saying?

5          THE WITNESS:  It is.  But it is the prospect's

6     prerogative.

7          THE COURT:  I understand.  Once you entered -- if you

8     had entered, for example, personal information about a recruit

9     two days before, on August 17th, 2009, that would have locked

10    out any RA from claiming a G-RAP bonus?

11       That is your testimony?

12         THE WITNESS:  That is correct.  That's how it worked.

13         THE COURT:  Go ahead.

14    BY MR. BEEVERS:

15    Q.  You would sometimes give a potential recruit a little bit

16    of time to call their RA to make sure the RA doesn't get

17    cheated out of their work?

18    A.  It is the prospect's prerogative to call them.  If they

19    wanted to pursue without that, then I would work them right

20    then and there.  You never turn anybody away.

21    Q.  Okay.  And you never turn anyone away, is that because you

22    did want to do your recruiting job successfully?

23    A.  That is correct.

24    Q.  Now, you testified on cross-examination that if you failed

25    to meet your quota there was some kind of remedial training?

60

1   A.   Yeah.   Extra work.

2   Q.   How bad was that?

3   A.   You know, you worked -- you had to listen to people talk

4   about how great they were at recruiting, and they gave you some

5   pointers on how to do it and stuff like that.

6        Remedial training.   You would get counseled.   It would go

7   on for a month.   And then if your numbers didn't come up, then

8   you have to do another month.   So on and so forth.

9   Q.   Okay.   Just educational kind of training?

10  A.   Correct.

11  Q.   Not physical training or anything?

12  A.   It was not disciplinary.   No.   It was remedial training.

13  It is sales classes.   Things of that nature.   How to talk to

14  applicants.   Things of that nature.

15  Q.   Okay.   Did you -- were you ever afraid that if you failed

16  to meet your quotas you would actually be terminated from the

17  service?

18  A.   No.

19  Q.   And at the time of, say, August 2009, what was your rank at

20  the time?

21  A.   I might have been an E7 by then.

22  Q.   And how many years between E7 and E8 would be normal in

23  that office?

24  A.   Probably about five.

25  Q.   So during the time that you worked with Mr. Sihner in the

1    G-RAP program, you were not immediately fighting for a

2    promotion; is that correct?

3    A.    No.

4    Q.    Maybe I asked that in the negative.

5          Were you immediately trying to get a promotion at the time

6    Mr. Sihner was working in the G-RAP program?

7    A.    That is part of our job was to advance, yes.

8    Q.    And with -- the prosecutor asked you about Austin Weber's

9    discharge for fraudulent enlistment related to asthma.

10         Were you ever questioned regarding his discharge?

11   A.    I got talked to about it, yes.  I got investigated about

12   it.

13   Q.    Okay.

14   A.    And I was cleared of that because the applicant signs a

15   paper before they go to MEPS.  And it says on there that my

16   recruiter did not coerce me and everything.

17         It was his signature on there.  Not mine.  My signature

18   wasn't on the 2808.

19         He had to sign a paper before he could go to MEPS.  And

20   then they look at the paper.  And if there is any yeses on

21   there, they question it.

22         It is also the applicant's signature on there that says,

23   hey, you know, I wasn't coerced by anybody, I came in here of

24   my own free will and answered these questions correctly.

25   Q.    After -- your understanding is after the investigators

62

1    talked to you, they still put him out of the Guard?

2    A.   I don't remember all the key points of that, but if he got

3    out, it was because -- yeah.

4    Q.   Now, you testified on cross-examination that you remember

5    meeting Lee Garman and Richard Sihner wasn't with him; is that

6    right?

7    A.   That is correct.

8    Q.   Do you remember if he had Mr. Sihner's business card?

9    A.   I do not recollect.

10   Q.   And do you remember whether Chris Cafaro had Mr. Sihner's

11   business card?

12   A.   I don't remember that either.

13   Q.   You were asked about Callie Vanda and whether you told her

14   about the G-RAP program.

15        Do you remember what you told her about the G-RAP program?

16   A.   That she could get money for referring recruits.

17   Q.   Do you know whether she ever actually signed up for the

18   G-RAP program?

19   A.   I do not know.

20   Q.   Your understanding of the G-RAP program is that the first

21   RA -- do you know whether two RAs can both do the G-RAP for the

22   same person?

23   A.   No.   When the RA enters a social security number into their

24   system, another RA can't poach them.

25   Q.   So if both Mr. Sihner and Ms. Vanda both put in for the

1    G-RAP program, whichever one did it first would get credit; is

2    that right?

3    A.   That is my understanding, yes.

4    Q.   And at the time you told -- how did you know Callie Vanda?

5    A.   She was in the unit.  I believe she was a soldier serving

6    in Alpha Company 297.  I believe, but I can't be sure.

7    Q.   Okay.  And when you talked to her about joining the G-RAP

8    program, was that connected to any particular potential

9    recruit?

10   A.   I don't -- I don't recollect that.  I told all soldiers to

11   sign up for the G-RAP program.

12   Q.   Okay.  And who's Amanda Plant?

13   A.   That was my former stepdaughter.

14   Q.   Do you know if she's ever met Mr. Sihner?

15   A.   Yes, she has.

16   Q.   Do they know each other?

17   A.   Yes, they do.

18   Q.   And was she connected to the military in any way?

19   A.   Yes, she was.

20   Q.   What was her connection?

21   A.   She was in the California Army National Guard.

22   Q.   Did you ever encourage her to join G-RAP?

23   A.   I did.

24   Q.   Did you ever conspire with Mr. Sihner to steal recruits

25   away from Amanda that she was entitled to?

64

1   A.   No.   I don't conspire with anybody.

2          MR. BEEVERS:   One moment.

3   BY MR. BEEVERS:

4   Q.   During your time as a -- during your whole time as a

5   recruiter, was it common for people to just walk in the Guard

6   office and enlist?

7   A.   That was rare.

8          MR. BEEVERS:   That's all.

9      (Cocounsel confer.)

10  BY MR. BEEVERS:

11  Q.   One other thing.   The prosecutor mentioned a recruit,

12  Weber, on cross-examination.

13      If Mr. Sihner put Mr. Weber's information into the G-RAP

14  computer, he didn't get that information -- did he get that

15  information from you?

16  A.   What was that?   One more time.

17  Q.   The prosecutor asked you about a recruit, Weber.

18  A.   Okay.   Yes.   I remember Weber.

19  Q.   And if Mr. Weber's -- if Mr. Sihner put Mr. Weber's

20  information into the G-RAP computer, he had to get that from

21  somewhere, right?

22  A.   That is correct.

23  Q.   And did you give Mr. Sihner Mr. Weber's personal

24  information so that he could put it into the G-RAP computer?

25  A.   I did not.

1    Q.  Did you give Mr. Sihner Mr. Donoho's information so he

2    could put it into the computer?

3    A.  I did not.

4    Q.  Did you give Mr. Sihner Mr. Juarez's information so he

5    could put it into the computer?

6    A.  I did not.

7    Q.  Did you give Mr. Ferguson's information to Mr. Sihner so he

8    could put it into the computer?

9    A.  I did not.

10   Q.  Did you give Mr. Ungureanu's information to Mr. Sihner so

11   he could put it into the computer?

12   A.  Mr. Ungureanu.  No, I did not give him information.

13   Q.  Did you give Mr. Straker's information to Mr. Sihner to put

14   it in the computer so he could get paid?

15   A.  I did not.

16   Q.  So if that information -- if Mr. Sihner was able to put the

17   information for those recruits into the G-RAP computer, as far

18   as you know, he had to get it from those recruits?

19   A.  Yes.  Pretty much.  That's how you had to get the

20   information.  He has to talk to them in order to get their

21   information.  That makes sense.

22   Q.  And when you testified that it was possible -- when you

23   testified that maybe Mr. Sihner shouldn't be paid for some of

24   these recruits, were you just guessing?

25   A.  I was.

1          MR. BEEVERS:  That's all.

2          THE COURT:  Redirect -- or recross.

3          MS. LYDON:  Recross.

4          THE COURT:  Recross.  Go ahead.

5                         RECROSS-EXAMINATION

6    BY MS. LYDON:

7    Q.  You just testified that if Sihner had these soldiers'

8    personal identifying information, he must have gotten it from

9    the soldiers themselves, didn't you?

10   A.  I didn't ask him where he got his information from.

11   Q.  But you didn't give it to him?

12   A.  I did not.

13   Q.  In fact, giving Sihner soldiers' social security numbers

14   would have been a crime?

15   A.  It's a violation of the HIPAA Act, yes.

16   Q.  And you didn't do that?

17   A.  I did not.

18   Q.  If you met soldiers first, before an RA met them, the RA

19   shouldn't have gotten paid, right?

20   A.  That is correct.

21   Q.  You testified on direct that it was the RA's job to get

22   you, the recruiter, a prequalified applicant, and it was the

23   recruiter's job to take it the rest of the way?

24          MR. BEEVERS:  Objection, Your Honor.  Asked and

25   answered.

1          THE COURT:  Overruled.

2     BY MS. LYDON:

3     Q.  Do you recall that testimony?

4     A.  Yes.

5     Q.  That's accurate?

6     A.  He did not bring me a prequalified recruit.  He brought me

7     a prospect.

8     Q.  But Sihner was supposed to bring people to you?

9     A.  He was supposed to put information into the computer.  He

10    didn't have to ever talk to me if he didn't want to.  He could

11    just put their information in the computer, and then I would

12    take it from there.

13    Q.  You testified on direct, didn't you, that the RA's job was

14    to get you a prequalified applicant?

15    A.  Okay.

16    Q.  Did you or did you not --

17    A.  I did.

18    Q.  Are you changing your testimony --

19         (Court Reporter requests the parties speak one at a time.)

20          THE COURT:  Hang on.  Stop.  Give Cathie a break.  We

21    didn't get any of that.

22         Stop.  Take a breath.

23         Slowly, Miss Lydon.

24         You wait for the question to finish.

25         Go ahead.

68

BY MS. LYDON:

Q.  You testified on direct that the RA's job was to get you a

prequalified applicant, and it was the recruiter's job to take

it the rest of the way, didn't you?

A.  I did.

Q.  Are you changing your story?

A.  Yes.  Am I allowed to do that?

    A prequalified applicant -- may I explain?

Q.  Is it still your story that the RA had to have contact

first with the applicant?

A.  That is correct.

Q.  All right.

A.  Prequalified applicant or a prospect, it is one and the

same.  It is the same verbiage.  So -- but they're a prospect.

A prospect is a prospect is a prospect.

    They didn't have to be -- a prequalified applicant, he

could preqaul them, or just get their information and put it in

the computer and then leave it to me to do it.

Q.  Okay.

A.  And then it becomes my job to prequalify.  It was the RA's

job to bring me a lead.  That's what the RA's job is.

Q.  So is it your testimony now that the RA's job was to get

you a prospect, and it was the recruiter's job to take it the

rest of the way?

A.  That is correct.

1  Q.   If you met a prospect first before an RA, Sihner shouldn't

2  have gotten any payment, should he have?

3  A.   If I met the prospect first, that is correct.

4  Q.   And no payment should have been made to Sihner for people

5  he just met around the armory, right?

6         MR. BEEVERS:   Objection.   Foundation.   If he knows the

7  DOCUPAK rules.

8         THE COURT:   Overruled in terms of his understanding.

9  You can give us your understanding.

10        THE WITNESS:   If people are milling about out front --

11  BY MS. LYDON:

12  Q.   Inside the armory, on the armory grounds, associated with

13  the armory.

14  A.   I don't know.   There are G-RAP rules.   I'm not too familiar

15  with them, so I wouldn't know that.

16        THE COURT:   Okay.   The answer is I don't know.

17    Go ahead.

18  BY MS. LYDON:

19  Q.   Sihner should have met recruits first before you?

20        THE COURT:   It's asked and answered.

21        MR. BEEVERS:   Asked and answered.   Objection.

22        THE COURT:   You already said that.   Yes.

23  BY MS. LYDON:

24  Q.   For all of those names that we talked about on direct, for

25  which you were the recruiter and Sihner got paid through G-RAP,

1  to your knowledge did he bring you any of those people?

2  A.  He brought me some of them.

3  Q.  Which ones?

4  A.  I cannot recollect.

5  Q.  It is your testimony that some of the people we talked

6  about were brought to you by Sihner?

7  A.  Yes.

8  Q.  Was John Russo brought to you by Sihner?

9  A.  I don't remember.

10  Q.  Do you remember any of the people we talked about --

11  A.  I remember --

12     (Court reporter requests the parties speak one at a time.)

13        THE COURT:  Stop.  Mr. Iraiqat, you interrupted her.

14  Let her finish the question.  Okay.

15     Take a breath.  Go ahead, Ms. Lydon.  Slow down.

16  BY MS. LYDON:

17  Q.  Do you actually remember Sihner bringing you any of the

18  soldiers we've talked about today?

19  A.  I do not.

20  Q.  So you're changing your testimony from just a minute ago

21  when you said you did?

22  A.  He may have brought them.  He brought me a lot of people.

23        MS. LYDON:  No further questions.

24        THE COURT:  All right.  You are done.  I will excuse

25  you.  Thank you for being here.  You are excused as a witness.

1          THE WITNESS:  I'm free to go?

2          THE COURT:  You are free to go.

3     All right.  We'll take our lunch break at this time.  We'll

4  come back at 1:15.

5     Again, all admonitions apply.  And during the break please

6  follow those admonitions and report any violation of those

7  admonitions to the court.

8     See you at 1:15.

9     (Jury excused at 12:00 p.m.)

10     (Excerpt concluded.)

11                         ---o0o---

12                  REPORTER'S CERTIFICATE

13                         ---o0o---

14
   STATE OF CALIFORNIA   )
15   COUNTY OF SACRAMENTO )

16

17     I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.
18
        IN WITNESS WHEREOF, I subscribe this certificate at
19  Sacramento, California.

20

21   /S/ Catherine E.F. Bodene
        CATHERINE E.F. BODENE, CSR NO. 6926
22        Official United States District Court Reporter

23

24

25

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br><br>Dell 630 Laptop Computer, Serial Number<br>BJB6GG1, CURRENTLY LOCATED AT 4500<br>Orange Grove Avenue, Sacramento, California 95841 | )<br>)<br>)<br>)<br>)<br>) |

Case No.  2:16 - SW - 0 4 7 2     AC

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ 8/18/16 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    8/4/16  3:05pm                     *(signature)*
                                                                          *Judge's signature*

City and state:      Sacramento, California                     Allison Claire, U.S. Magistrate Judge
                                                                          *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____

Signature of Judge                                    Date